Heather BENEDICT and Raymond Benedict, et al., Respondent,

v.

NORTHERN PIPELINE CONSTRUCTION, et al., Appellant.

Nos. WD 58007, WD 58019.

Missouri Court of Appeals, Western District.

April 24, 2001.

Richard T. Merker, Kansas City, for appellant.

Ronald J. Stites, Kansas City, for respondent.

Before ELLIS, Presiding Judge, LOWENSTEIN, Judge and BRECKENRIDGE, Judge.

ELLIS, Presiding Judge.

Respondent Heather A. Benedict filed suit against Appellant Northern Pipeline seeking damages for injuries she sustained in a fall when a sink hole developed in a flush-filled excavation area of the sidewalk near her home. The case was tried to a jury in the Circuit Court of Jackson County, and Ms. Benedict was awarded a judgment in the amount of $275,000. Northern Pipeline brings this appeal.

The following is a summary of the facts viewed in the light most favorable to the verdict. In the summer of 1996, Appellant excavated a portion of the sidewalk on Ms. Benedict's street in St. Joseph, Missouri in order to perform work on the gas pipelines located thereunder. While the hole was open, Appellant maintained a barricade around the area. After the work on the gas pipelines was completed, Appellant "flush-filled" the hole with compacted dirt and gravel and removed the barricades.

About a week after Appellant flush-filled the hole and removed the barricades, Ms. Benedict left her house to put up garage sale signs in her neighborhood. On the way back to her house, Ms. Benedict walked over the flush-filled portion of the sidewalk, which appeared to be compacted and level. However, when she stepped on that portion of the sidewalk, a sink-hole developed and caused Ms. Benedict to fall on her backside. As a result of the fall, Ms. Benedict sustained a fractured and displaced coccyx in addition to minor injuries to several other parts of her body. Subsequently, Ms. Benedict and her husband Raymond Benedict brought the instant action alleging negligence on the part of Appellant and Missouri Gas Energy. The jury returned a verdict for Ms. Benedict in the amount of $275,000 against Appellant, but found for defendant Missouri Gas Energy. Appellant prosecutes this appeal. Missouri Gas Energy is not a party to the appeal.

Appellant brings ten points on appeal. In its first point, Appellant claims the trial court erred in finding that Appellant waived two of its peremptory challenges by not making new selections after the court found that Appellant's original selections were race-motivated. Appellant asserts that the trial court's request that its attorney make different peremptory strikes was an attempt to force counsel to admit that he made racist choices. Appellant argues that counsel's refusal to exercise his peremptory strikes on other jurors should not have been considered to be a waiver of those strikes by the trial court.

■ Appellant initially claims that the trial court violated § 494.480(1)[1] which states "[i]n trials of civil causes each party shall be entitled to peremptorily challenge three jurors." In this case, the trial court afforded Appellant the opportunity to challenge up to four jurors. When the court later found that two of Appellant's challenges were impermissibly race-motivated, the court repeatedly offered to let Appellant exercise those two challenges in a race-neutral manner on other jurors. Appellant refused. The statute does not state that each party "must" or "shall" exercise three challenges; it merely gives the parties to a civil trial the right to do so. The fact that Appellant was entitled to challenge at least three jurors under § 494.480(1) does not prohibit Appellant from waiving that right. Accordingly, we

---

**1.** All statutory references are to RSMo Cum. Supp.1998 unless otherwise noted.

must examine whether the trial court properly determined that Appellant waived this statutory right.

■ The question of whether a waiver has occurred is one of fact and is established by the totality of the circumstances. *State v. Powell,* 798 S.W.2d 709, 713 (Mo. banc 1990). "[T]he trial court's findings of fact concerning waiver will not be overturned unless clearly erroneous." *Id.* "A finding is clearly erroneous if the reviewing court is left with the definite and firm conviction that a mistake has been made based on an evaluation of the entire evidence." *State v. Johnson,* 930 S.W.2d 456, 461 (Mo.App. W.D.1996).

During the course of argument on Ms. Benedict's Batson challenge, the following exchange occurred:

The Court: I think the last time I had one of these was in a—my real problem is with Ms. Gee, where you mentioned she rendered a verdict in a civil case. So did Herman Branstetter, who is a white male, Juror No. 21. The point is, doing that kind of comparison and making those determinations, I have no record. And I don't have any independent recollection of any nonverbal behavior of either Juror No. 10 or Juror No. 17.

I believe you have stated reasons as to Juror No. 32, but as to 10 and 17 I don't believe those are race-neutral reasons. For that reason, I will ask you to reconsider your strikes . . .

Mr. Merker: The court asked me to reconsider my position. For me to reconsider my position, I would be agreeing that I have made a racially-motivated strike and I refuse to do that because I didn't. . . . But, with all due respect, for the court to ask me to reconsider is asking me to say I was racially motivated and I refuse to do so.

\* \* \*

The Court: You know, I have never had this situation before. I have actually had attorneys reconsider their strikes before.

Mr. Merker, for whatever reasons you have stricken these people, I have made a finding that your reasons are not race-neutral. I'm extremely bothered by strikes 10 and 17 because they are of people that you have not stated have said or done anything, other than Ms. Gee saying that she returned a plaintiff's verdict or agreed to a plaintiff's verdict in a civil suit, where others have also returned verdicts for plaintiffs in civil suits who are not of a minority race.

\* \* \*

So, again, I am asking you—and this is not any disparaging remark toward you—to reconsider your selections.

Mr. Merker: Judge, I hear you, and I'm sorry; but I'm not going to do it. The court will have to do whatever you have to do. I'm not going to, on this record, after 28 years of trying civil lawsuits and getting feelings out of jurors as to how they're leaning based upon their impressions, how they act, what they do, how they shake their head, and having a relatively-successful trial practice, have this record reflect at this point in my career that I'm discriminating against anybody based upon their race. If the court thinks it's inappropriate, I suggest that you declare a mistrial, bring us in a new panel, whatever you want to do, but I just refuse to change my strikes.

The following morning, the trial court announced:

I have had an opportunity to look at case law on the issue from yesterday, and I feel the law is pretty clear that if a party is given an opportunity to make peremptory strikes and chooses not to that they are deemed waived.

Mr. Merker, I have given you two opportunities to make peremptory strikes, and you have rejected them both. So the position is to consider those waived, and under the law I'm required to pick the first 12 jurors that remain.

■ The trial court clearly found that two of Appellant's initial strikes were race motivated and ruled against Appellant on Respondent's *Batson* challenge. The proper procedure in such cases is to allow the offending party an opportunity to exercise its strikes in a race-neutral manner on other jurors. *State v. Parker*, 836 S.W.2d 930, 936–37 (Mo. banc 1992). The trial court provided this option to Appellant and strongly encouraged Appellant to take advantage of that opportunity. Appellant's counsel vehemently refused to make new strikes and insisted that the court should declare a mistrial and bring in a new jury panel if the court felt a remedy were warranted under *Batson*.

■ The trial court was left with little choice but to deem those peremptory strikes to have been waived and proceed with trial. Contrary to Appellant's assertion that the trial court should have declared a mistrial and brought in a new jury pool, "[a] mistrial is not the appropriate remedy." *State v. Link*, 965 S.W.2d 906, 909 (Mo.App. S.D.1998). "Quashing the panel and commencing the jury selection anew does not really correct the error. The [offending party] is simply accorded a new opportunity to obtain a jury composed according to race-neutral criterion; the discrimination endured by the excluded venirepersons goes completely unredressed since they remain wrongfully excluded from jury service." *Parker*, 836 S.W.2d at 936.

As previously noted, the proper remedy in this situation was to disallow Appellant's offending strikes and afford Appellant the opportunity to exercise those strikes in a race-neutral fashion. *Id.* at 936–37. The trial court extended this option to Appellant, and Appellant refused to take advantage of it. Indeed, after the court ruled that Appellant had waived those challenges, Appellant merely offered argument that the trial court had improperly applied *Batson* and did not ask the trial court to reconsider its decision regarding the waiver of the challenges. Under these circumstances, the trial court did not err in finding that Appellant waived the two peremptory strikes. Point denied.

In its second point, Appellant claims the trial court failed to observe the proper procedure in conducting the *Batson* challenge. Appellant further argues that Respondent failed to meet her burden of proof in establishing that Appellant's stated reasons for the strikes were pretextual and that the trial court erred in finding that his reasons were not race-neutral.

■ Appellant contends that the trial court did not observe the proper procedure in handling Respondent's *Batson* challenge. Missouri does not follow the procedure suggested in *Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986),[2] and follows its own unitary procedure for the vindication of *Batson* claims. *State v. Nathan*, 992 S.W.2d 908, 914 (Mo.App. E.D.1999). Under that procedure, a party must first raise a *Batson* challenge by identifying each venireperson who was improperly struck and the cognizable protected group to which that individual belongs. *State v.*

**2.** The holding in *Batson* applied to criminal cases. It was extended to civil cases in *Edmonson v. Leesville Concrete Co., Inc.*, 500 U.S. 614, 111 S.Ct. 2077, 114 L.Ed.2d 660 (1991).

*Smith*, 5 S.W.3d 595, 597 (Mo.App. E.D. 1999). Once that is done, the striking party must provide a race-neutral reason for the strike. *Johnson*, 930 S.W.2d at 460. Assuming the striking party is able to articulate an acceptable explanation for the strike, the party asserting the *Batson* challenge then needs to show that the striking party's proffered reasons for the strikes are pretextual and that the strikes were racially motivated. *Parker*, 836 S.W.2d at 939. The party asserting the *Batson* challenge may meet its burden through evidence or analysis that shows that the striking party's explanation is pretextual. *Johnson*, 930 S.W.2d at 460.

■ In the case at bar, the trial court followed the procedure set forth by the case law. Following Appellant's announcement of its peremptory strikes, Respondent's counsel raised the *Batson* challenge, identified the specific venirepersons Respondent felt were improperly struck, and stated the protected class to which they belonged. The trial court then asked Appellant to explain those strikes. Counsel for appellant offered the following reasons for his strikes:

> I'll start with Ms. Gee. I don't know if the court caught this, but every time that Mr. Dedner was saying bad things about the gas company, and the like, Ms. Gee was nodding affirmatively and essentially joining in with him on those types of things. I don't like jurors who don't want to be here. She's one of them that doesn't want to be here. Secondly, my recollection is that she sat on a jury that returned a verdict for a plaintiff in a rental car case rather than it being hers, but I will let the record reflect whether that's correct or not. Those are the reasons why I decided to take Ms. Gee off.

> \* \* \*

> On Vanessa Saunders, I got no positive feelings out of her whatsoever. She was reacting very positively to the comments made by Mr. Stites—and when I say reacting I mean visually reacting—about the fact that just because you don't have a whole bunch of medical bills can you be given money, and she was affirmatively shaking her head about that. She was affirmatively shaking her head rather dramatically on the issue of punitive damages. I did not get good vibes out of her when I was voir diring the jury, and I felt like I got pretty good vibes out of the rest of them.

> The other one is No. 32, Ms. Myles. Ms. Myles was a plaintiff herself in an automobile accident case, and she talked about neck and back problems. I believe that she said it was subtle. She works at a hospital as an admissions counselor. That's all I need. She's an ex-plaintiff as far as I'm concerned.

After Appellant offered these explanations, counsel for Respondent offered his argument that the strikes were pretextual. Counsel expressed doubts that any such non-verbal communication had occurred and noted that the record did not reflect any type of bias on the part of any of the challenged jurors.

The trial court then found that Appellant had stated a non-racial reason for striking Ms. Myles, but that the other two strikes were not race-neutral. The trial court stated that it did not remember noticing any non-verbal behavior on the part of the two venire-persons. The trial court also noted that other non-minorities in the venire panel met the same criteria expressed by Appellant with regard to Ms. Gee. In addition, the trial court referred to its own observations of counsel's behavior when it was proposed that Ms. Gee be struck for cause, and the court expressed

concern that the jury represent a fair cross-section of the community.

The trial court clearly observed the prescribed procedure in hearing Ms. Benedict's *Batson* challenge. Respondent properly asserted a *Batson* challenge, Appellant offered its explanations, and Respondent then offered analysis and argument that Appellant's explanations were pretextual.

Appellant's real argument in this point is that the trial court erred in finding that its reasons for the strikes were racially motivated. Appellant claims that Respondent did not meet her burden of proof in establishing that its explanations were pretextual.

In analyzing the striking party's explanations to determine whether the party asserting the *Batson* challenge met its burden of showing the strikes were racially motivated, the trial court must primarily consider the plausibility of the striking party's explanations in light of the totality of the facts and circumstances surrounding the case. *Johnson,* 930 S.W.2d at 461; *State v. Shaw,* 14 S.W.3d 77, 82 (Mo.App. E.D.1999). "Objective explanations are given greater weight, but the [striking party] may rely on hunches in making peremptory strikes as long as its subjective intent is race-neutral." *Johnson,* 930 S.W.2d at 461. In assessing the plausibility of the striking party's explanation for the strikes, any facts or circumstances that detract from or lend credence to the striking party's explanation are relevant, including whether any similarly situated white venirepersons were not challenged. *Id.* A number of other factors

have been set forth in the case law for determining whether the party raising the *Batson* challenge has carried the burden of proof and established the existence of discrimination in the strikes including: (1) the degree of logical relevance between the explanation and the case to be tried in terms of the nature of the case and the types of evidence to be adduced, (2) the striking attorney's demeanor or statements during voir dire, and (3) the court's past experiences with the striking attorney. *Parker,* 836 S.W.2d at 940.

When reviewing the trial court's decision regarding a *Batson* challenge, " '[b]ecause of the extensive role of the trial court and because the findings of fact turn largely on an evaluation of credibility, a reviewing court must give great deference to those findings.' " *Bowls v. Scarborough,* 950 S.W.2d 691, 700 (Mo. App. W.D.1997) (quoting *State v. Mack,* 903 S.W.2d 623, 629 (Mo.App. W.D.1995)). "The trial court's determination of the propriety of the strike will not be reversed unless it was clearly erroneous, that is, we are left with a firm conviction that a mistake was made." *Shaw,* 14 S.W.3d at 82.

In assessing this *Batson* challenge, the trial court appears to have considered appropriate factors in reaching its conclusion.[3] The court specifically noted both that it had not observed the nonverbal behavior relied upon in counsel's explanation and that similarly situated white jurors had not been struck by Appellant. The court referred to its own observation regarding the behavior of counsel. The trial court found that counsel's reasons for striking the two jurors were not

---

**3.** While Appellant complains that Ms. Benedict improperly offered argument indicating that a member of the law firm retained by Ms. Benedict had observed a member of Appellant's firm use all of its peremptory strikes to remove minorities from a venire panel in an-

other case and that such argument might have tainted the trial court's assessment, the record does not reflect that the trial court relied upon that argument in making its decision.

race-neutral and asked counsel to reconsider those strikes. In making its findings, the trial court implicitly found that counsel's explanations for striking those two individuals were not credible. Having reviewed the record in this case, this court is simply not left with a definite and firm conviction that a mistake has been made. The trial court did not clearly err in finding that Appellant's strikes were improper. Point denied.

In its third point, Appellant argues that the trial court erred in admitting evidence of complaints that had been filed with Appellant related to other holes that had been flush-filled. Appellant claims that those complaints were not relevant to the case because they did not involve individuals actually getting injured as a result of the defects in construction. Appellant further argues that the incidents in the complaints were not sufficiently similar to Ms. Benedict's accident and that the majority of the complaints were filed after Ms. Benedict was injured.

 Trial courts are afforded a great deal of discretion in determining whether to admit evidence of similar occurrences. *Newman v. Ford Motor Co.,* 975 S.W.2d 147, 151 (Mo. banc 1998). "This Court's review is limited to whether the trial court determined that the evidence was relevant and that the occurrences bore sufficient resemblance to the injury-causing incident, while weighing the possibility of undue prejudice and confusion of issues." *Id.* "Judicial discretion is abused when the trial court's ruling is clearly against the logic of the circumstances then before the court and is so

arbitrary and unreasonable as to shock the sense of justice and indicate a lack of careful consideration; if reasonable people can differ about the propriety of the action taken by the trial court, then it cannot be said that the trial court abused its discretion." *Sanders v. Hartville Milling Co.,* 14 S.W.3d 188, 204 (Mo.App. S.D.2000) (quoting *Richardson v. State Hwy. & Transp. Comm'n,* 863 S.W.2d 876, 881 (Mo. banc 1993)).[4]

Our review of this point requires that we decide whether the trial court abused its discretion in: (1) determining that the complaints were sufficiently similar to the incident involved in the case at bar; (2) finding that the complaints were logically relevant to the case; and (3) deciding that the probative value of the evidence outweighed any prejudicial effect it might have. We review the issues in that order.

 "[T]he determination of what is evidence of a similar occurrence is often subjective." *Pierce v. Platte–Clay Elec. Co-op., Inc.,* 769 S.W.2d 769, 775 (Mo. banc 1989). When Ms. Benedict submitted the complaints to the trial court, the court reviewed the complaints and only admitted those complaints that related to sink-hole type problems which developed on sidewalks or driveways repaired by Appellant. The court indicated that the complaints being admitted involved holes in sidewalks or driveways that developed after Appellant removed concrete, made repairs, and utilized a process known as re-compaction, the same process utilized on the sidewalk where Ms. Benedict was injured, in repairing the concrete. The trial court found

---

4. "An 'abuse of discretion' standard, by definition, means that, in many instances, the ruling of the trial court would be upheld regardless of whether the evidence had been admitted or excluded." *Lohmann By and Through Lohmann v. Norfolk & Western Ry. Co.,* 948 S.W.2d 659, 669 (Mo.App. W.D.1997)

(quoting *Copeland v. Mr. B's Pool Centers, Inc.,* 850 S.W.2d 380, 381 (Mo.App. E.D. 1993)). "The appellate court simply defers to the trial court in view of its superior opportunity to evaluate the proffered evidence in the context of the trial." *Id.* (quoting *Copeland,* 850 S.W.2d at 381).

those complaints involved incidents and conditions sufficiently similar to the hole in front of Ms. Benedict's house to be relevant to the case.

The court apparently gave a great deal of thought to which complaints were sufficiently similar to the incident involving Ms. Benedict. The trial court reviewed the complaints and only allowed into evidence those complaints involving problems with Appellant's repair of holes in sidewalks or driveways. From the record before us, we cannot find that the trial court abused its discretion in finding that these complaints involved incidents sufficiently similar to the incident involved in the case at bar.

■■■ We next examine whether the trial court abused its discretion in finding that these complaints were logically relevant to the case. Evidence is logically relevant if it tends to prove or disprove a fact in issue or corroborate other evidence. *Guess v. Escobar*, 26 S.W.3d 235, 242 (Mo. App. W.D.2000).

The complaints filed prior to Ms. Benedict's injury were submitted to show knowledge on the part of Appellant of the need to properly compact, inspect and maintain holes created during the course of its business. Ms. Benedict sought to introduce the complaints to show that Appellant knew problems were likely to occur in their recompaction process and that Appellant had a policy or pattern of ignoring complaints for long periods of time and waiting for numerous complaints to be filed before fixing a problem.[5] "[T]he nature, frequency or notoriety of the incidents may well reveal that defendant knew of them or should have discovered the

danger by due inspection." *Lohmann By and Through Lohmann v. Norfolk & Western Ry. Co.*, 948 S.W.2d 659, 668 (Mo.App. W.D.1997) (quoting *Stacy v. Truman Medical Center*, 836 S.W.2d 911, 926 (Mo. banc 1992)). Accordingly, these complaints were logically relevant to show the frequency with which such problems occurred and the disregard of Appellant in failing to properly perform the work or to make the necessary repairs in a timely fashion. The trial court did not abuse its discretion in finding the reports were logically relevant to the case.

■■■ Likewise, the trial court did not abuse its discretion in finding the complaints filed after Ms. Benedict's injury were logically relevant to the case. The trial court found that the complaints filed after Ms. Benedict's injury were relevant to the issue of punitive damages to show that Appellant had a pattern of showing conscious disregard and reckless indifference to this type of problem.[6] "Evidence of other acts of defendant than those alleged for which damages are sought, both preceding as well as following the particular acts, is admissible under an issue of exemplary damages if so connected with the particular acts as tending to show defendant's disposition, intention, or motive in the commission of the particular acts for which damages are claimed." *Charles F. Curry & Co. v. Hedrick*, 378 S.W.2d 522, 536 (Mo.1964).

Finally, we evaluate whether the trial court abused its discretion in finding that the probative value of this evidence outweighed any prejudicial effect it had on the jury. Appellant has failed to identify

5. Ms. Benedict did not offer the evidence to establish the condition of the area where she fell. Ample evidence was submitted clearly depicting the condition of the sidewalk where she fell.

6. "Evidence admissible for one purpose may be admitted even though it may be improper for other purposes." *Pierce v. Platte–Clay Elec. Co-op., Inc.*, 769 S.W.2d 769, 775 (Mo. banc 1989).

any prejudice resulting from the admission of this evidence aside from stating in its reply brief that the complaints encouraged the jury to view Appellant as a party that commits negligence on a regular basis. However, Appellant then states that none of the complaint forms indicate that Appellant committed a negligent act. Accordingly, even if the probative value of the evidence was minimal, Appellant's own argument refutes any contention that prejudice resulted from the admission of the complaints into evidence. Furthermore, the jury did not award any punitive damages. The trial court did not abuse its discretion in finding the probative value of the complaints outweighed any prejudicial effect they might have on the jury. Point denied.

In its fourth point, Appellant argues that the trial court erred in refusing to give a comparative fault instruction which would have allowed the jury to assess fault to Ms. Benedict. The trial court rejected the instruction, finding that there was no evidence presented that Ms. Benedict knew of the danger posed by the sidewalk or bore any fault in her injury. On appeal, Appellant argues that this finding by the trial court was erroneous because the evidence reflects that Ms. Benedict had seen Appellant making repairs to the area in the weeks prior to her injury and that Ms. Benedict did not walk over the sidewalk when she left her house that day to put up signs. From that evidence, Appellant claims that a reasonable jury could have found that she was aware of the dangerous condition but then chose to ignore the danger walking back to the house.

Initially we note that the instructions rejected by the trial court did not include language requiring a finding that Ms. Benedict was aware of the dangerous condition. Thus, the proffered instructions misstated the law and were properly rejected

by the trial court. Since the proffered instruction failed to submit the appropriate theory to the jury, the trial court did not error in refusing to tender the instruction. *Overcast v. Billings Mutual Ins. Co.*, 11 S.W.3d 62, 73 (Mo. banc 2000).

Additionally, the evidence in this case simply does not support the submission of a comparative fault instruction. "When the issue on appeal is the sufficiency of the evidence to support the trial court's submission of comparative fault to the jury, all the evidence and favorable inferences from the evidence are considered to the extent they support the submission." *Smith v. Quallen*, 27 S.W.3d 845, 847 (Mo.App. E.D.2000). "If there is evidence from which a jury could find that plaintiff's conduct was a contributing cause of her damages, parties to a negligence action are entitled to have their case submitted to the jury under comparative fault principles." *Rudin v. Parkway School Dist.*, 30 S.W.3d 838, 841 (Mo.App. E.D. 2000). However, the instruction must be supported by substantial evidence and cannot be supported by mere speculation or conjecture. *Hughes v. Palermo*, 911 S.W.2d 673, 674 (Mo.App. E.D.1995).

The trial court found that all of the evidence presented at trial reflected that Ms. Benedict was unaware of the condition of the sidewalk and thought the area was safe. The record indicates that Ms. Benedict had previously seen barricades around the sidewalk and that they had been removed a week before her injury. The gravel portion of the sidewalk appeared smooth, and there was no indication that it would sink if stepped upon. Appellant did not present any evidence that Ms. Benedict or any other member of the general public would be able to recognize the danger posed by the sidewalk. In fact, at trial, Appellant argued that there was no

apparent danger and no way that Appellant could have known a problem existed.

Appellant relies solely upon the fact that Ms. Benedict saw work being performed in the area prior to her accident and did not walk across the defective portion of the sidewalk upon leaving her house to argue that a comparative fault instruction was warranted in this case. Appellant claims that it is reasonable to infer from this action that Appellant was aware of the danger posed by the section of sidewalk. That is simply not a reasonable inference. No reasonable juror could have concluded that Ms. Benedict bore any fault in this matter from that evidence.

Appellant's argument is based entirely on speculation and conjecture. The trial court did not err in finding the evidence was insufficient to support the submission of a comparative fault instruction. Point denied.

██ In its fifth point, Appellant claims the trial court erred in precluding Appellant from asking Ms. Benedict's chiropractor if he had been paid for $3,300 worth of services he provided in the treatment of Ms. Benedict's injury. Appellant claims that the trial court improperly determined that this area of inquiry was irrelevant.

At trial, Appellant sought to ask the chiropractor if his bills had been paid. Ms. Benedict objected to that question on relevancy grounds and because the answer might illicit testimony about insurance payments. Appellant then argued that the chiropractor's answer might be relevant if Appellant were able to show that the chiropractor would not be paid unless Ms. Benedict prevailed at trial. The trial court sustained Ms. Benedict's objection because it did not know what the chiropractor's testimony would be and because the answer might improperly reference insurance payments.

On appeal, Appellant argues that testimony regarding unpaid bills would tend to show that the chiropractor had a pecuniary interest in the outcome of the case and that his testimony was biased. Appellant contends that the trial court improperly prevented him from impeaching the witness.

██ Appellant failed to make an offer of proof reflecting what the testimony of the chiropractor would have been. Thus, neither the trial court nor this court has any way of knowing what the testimony of the chiropractor would have been. "When an objection is sustained to proffered evidence, the offering party must show its relevancy and materiality by way of an offer of proof in order to preserve the issue for appellate review." *State v. Langston*, 889 S.W.2d 93, 99 (Mo.App. E.D.1994). Appellant failed to make such an offer, and accordingly, this issue has not been preserved for appeal.[7] Point denied.

---

7. Moreover, "[t]he scope of cross-examination and the determination of matters of witness credibility are largely within the discretion of the trial court." *State v. Taylor*, 944 S.W.2d 925, 935 (Mo. banc 1997). "The trial court abuses its discretion when its ruling is clearly against the logic of the circumstances then before the trial court and is so unreasonable and arbitrary that the ruling shocks the sense of justice and indicates a lack of careful deliberate consideration." *Oldaker v. Peters*, 817 S.W.2d 245, 250 (Mo. banc 1991) (quoting *Richardson v. Colonial Life & Accident Ins.*

*Co.*, 723 S.W.2d 912, 915 (Mo.App. W.D. 1987)).

Appellant has not cited a single case in which the fact that a doctor's bills had not yet been paid was deemed to establish that the doctor had an interest in the outcome of the trial. Even assuming, *arguendo*, that the chiropractor would have testified that his bills remained unpaid, that fact alone does not establish that he has an interest in the outcome of the case or otherwise call into question his credibility. The trial court could not

 In its sixth point, Appellant argues that the trial court erred in excluding from evidence a list of cases in which one of Respondent's experts had testified. After extensively questioning the expert about that list, Appellant sought to admit that list into evidence. Respondent objected to the admission of the list on the grounds that it was cumulative and collateral. The trial court sustained Respondent's objection and excluded the list from evidence.

"The admission of evidence is within the sound discretion of the trial court, and its decision to admit or exclude evidence will not be disturbed absent an abuse of that discretion." *Smith v. Director of Revenue*, 13 S.W.3d 700, 706 (Mo.App. W.D.2000). " 'The trial court abuses its discretion when its ruling is clearly against the logic of the circumstances then before the trial court and is so unreasonable and arbitrary that the ruling shocks the sense of justice and indicates a lack of careful deliberate consideration.' " *Oldaker v. Peters*, 817 S.W.2d 245, 250 (Mo. banc 1991) (quoting *Richardson v. Colonial Life & Accident Ins. Co.*, 723 S.W.2d 912, 915 (Mo.App. W.D.1987)).

On appeal, Appellant argues that the list was relevant and should have been admitted to impeach the following testimony:

Q: You do a lot of consulting with lawyers or for law firms in Kansas City; is that right?

A: That's correct. I have been a consultant since about 1975.

Q: And your role in the cases—it really doesn't matter which side you're on— your role is to deal with numbers?

A: That's correct.

Q: In fact, you have testified for the Wallace Saunders firm here?

A: I have worked for virtually every firm in town, yes.

Appellant claims that it should have been allowed to introduce the list to impeach the expert's testimony that he had testified for Wallace Saunders.

However, Appellant was allowed to cross-examine the expert with that document, and the following exchange occurred:

Q: I'll hand you Defendant's Exhibit No. 160; would you tell the jury what that document is.

A: It's a list of my cases where I provided testimony in personal injury and commercial litigation cases and antitrust cases. I keep that for a five-year period.

Q: Is that a current, complete, and accurate list of all cases over the last five years where you have either given deposition testimony or testified in court similar to what you're doing today?

A: Right, it is.

Q: Do you see the name of any of the lawyers from my office on that exhibit?

A: I work for your firm. I don't testify. I'm hired as a consultant.

Q: I understand that. Looking at the exhibit, Doctor, doesn't it list the name of the case, when you testified, whether it was a deposition or trial, where you testified, and who the attorney was?

A: Yes. When I'm retained by your firm, as I said, I'm retained as a consultant as opposed to a testifying expert, which is common with the defense. The burden of proof is with the plaintiff. When I'm hired by the defense, what I'm usually asked to do is evaluate somebody else's report.

Q: Would you agree with me that over the last five years you have never testi-

be deemed to have abused its discretion in excluding such testimony.

fied in a case involving our firm or it would be on that list?

A: That's correct.

Q: Thank you. Who did you consult with last for our firm?

A: I probably did about five cases for Frank Saunders this past year.

Q: You did?

A: Yes.

Appellant has failed to indicate how the admission of the document would further impeach the expert's testimony or how it was prejudiced by the exclusion of the list. Appellant was allowed to cross-examine the expert with the document, and the expert clarified his testimony and unequivocally agreed with Appellant that he had not testified for Wallace Saunders and had only acted as a consultant for that firm.

This document was clearly cumulative for the purpose that Appellant sought to introduce it and did not contain any evidence relevant to Appellant's case in chief. Moreover, Appellant cannot establish prejudice from the failure to admit this document. The trial court did not abuse its discretion in excluding this document from evidence. Point denied.

In its seventh point, Appellant argues that the trial court erred in refusing to allow Appellant to admit into evidence what it asserts were Ms. Benedict's employment records from the Rosebud Lounge or to ask Deanna Stout about the nature of Ms. Benedict's work there. Appellant argues that this evidence should have been admitted to impeach Ms. Benedict's testimony that she had not worked at that establishment.

With regard to the employment records, Appellant never attempted to introduce those records into evidence. Accordingly, the trial court was never asked to rule on their admissibility. We certainly cannot find that the trial court erred in excluding from evidence documents that the Appellant never sought to admit. Under Rule 84.13(a), " 'allegations of error not presented to or expressly decided by the trial court shall not be considered in any civil appeal from a jury tried case.' " *Evans v. Wal–Mart Stores, Inc.,* 976 S.W.2d 582, 584 (Mo.App. E.D.1998) (quoting Rule 84.13(a)).

■ With regard to Ms. Stout's testimony, Appellant contends the trial court improperly limited its ability to impeach Ms. Benedict's testimony. On cross-examination of Ms. Benedict, Appellant asked Ms. Benedict if she ever worked at the "Rosebud Lounge, a topless bar." Ms. Benedict replied that she had not worked at the Rosebud Lounge but that her sister-in-law, who shared the same name, had worked there.

Subsequently, Appellant sought to admit testimony from Ms. Stout that Ms. Benedict had worked as a stripper at the Rosebud Lounge and that Ms. Benedict had told Ms. Stout that she had worked at another strip-club in Kansas City. Appellant also wished to submit testimony from Ms. Stout describing the outfits that Ms. Benedict wore while working at the Rosebud Lounge.

Prior to Ms. Stout taking the stand, Ms. Benedict moved to exclude Ms. Stout's testimony because it was collateral to any issue in the case and was merely meant to impugn Ms. Benedict's character with evidence that she might have been a stripper earlier in life. Appellant argued that it should be allowed because the testimony presented by Ms. Benedict had "painted her as a Madonna."

The trial court ruled that Ms. Stout could testify to anything that directly contradicted the testimony of Ms. Benedict that she had not worked at the Rosebud Lounge. However, the court refused to

allow testimony regarding the nature of her work. The court found that the nature of her employment prior to her injury was not relevant to the case and was unnecessary to contradict Ms. Benedict's testimony.[8] Ms. Stout subsequently testified that Ms. Benedict had worked at the Rosebud Lounge.[9]

On appeal, Appellant claims the trial court erred in restricting Ms. Stout's testimony to whether Ms. Benedict had worked at the Rosebud Lounge. Appellant claims testimony describing Ms. Benedict's work costumes and the nature of her work was necessary to adequately contradict Ms. Benedict's cross-examination testimony that she had not worked there.

"It is not error for a trial judge to exclude offers of extrinsic evidence for impeachment relating to a collateral matter." *State v. Dunson*, 979 S.W.2d 237, 242 (Mo.App. W.D.1998). " 'The general rule is that an opposing party is bound by a witness' answers elicited on cross-examination with respect to collateral matters and will not be permitted to introduce extrinsic evidence to refute the answers.' " *Brewer v. Raynor Mfg. Co.*, 23 S.W.3d 915, 919 (Mo.App. S.D.2000) (quoting *Cline v. William H. Friedman & Assoc.*, 882 S.W.2d 754, 760 (Mo.App. E.D.1994)). "The rationale underlying this rule is to shield the jury from a proliferation of issues which would require the court to go into the merits of such collateral matters and to avoid the unfairness and surprise of requiring the opposing party to disprove issues not raised by the pleadings." *Cline*, 882 S.W.2d at 760. " 'The test as to whether a matter is collateral ... is whether the party seeking to introduce it for purposes of contradiction would be en-

titled to prove it as a part of his case.' " *Brewer*, 23 S.W.3d at 919 (quoting *D.K.L. by K.L. v. H.P.M.*, 763 S.W.2d 212, 218 (Mo.App. S.D.1988)).

In the case at bar, Appellant has failed to show how the extrinsic evidence in question would serve any purpose independent of mere contradiction of Ms. Benedict's testimony. Ms. Stout's testimony regarding Ms. Benedict's employment as a stripper prior to her injury was clearly irrelevant and inadmissible to disprove any element of the plaintiff's case or to prove any element of Appellant's defense in the case. The only claim Appellant made to the trial court regarding the relevance and admissibility of this evidence was that it contradicted Ms. Benedict's cross-examination testimony that she had never been employed at the Rosebud Lounge. Any testimony related to Ms. Benedict's career as a stripper prior to her injury was collateral to the issues in this case, and the trial court did not err in excluding that testimony. Indeed, it would have been error for the court to admit the evidence. *See, Graf v. Wire Rope Corp. of America*, 861 S.W.2d 588, 590 (Mo.App. W.D.1993) (holding evidence which contradicted testimony given by the plaintiff related to answers on her employment application was collateral to any issue in the case and was erroneously admitted into evidence) ("The erroneous admission of the extrinsic proof to contradict plaintiff's testimony on matters collateral to the issues in the case requires reversal."); *Cline*, 882 S.W.2d at 760 (holding the trial court committed reversible error by admitting testimony from a patient with dry eye to contradict the defendant doctor's testimony that he had never

---

8. Appellant acknowledged that the sole purpose of the testimony was to call into question Ms. Benedict's credibility and was unrelated to any substantive issue in the case.

9. Appellant did not attempt to elicit any further testimony and did not voir dire Ms. Stout about what her testimony would have been.

had a patient develop a case of dry eye because such testimony was collateral to any issue in the case). Point denied.[10]

■ In its eighth point, Appellant claims the trial court erred in denying its motion for directed verdict because the city of St. Joseph had a non-delegable duty to maintain the sidewalk. Appellant claims that because of that duty only the city could be held liable for Ms. Benedict's injury.

■ The fact that the city has a non-delegable duty to maintain sidewalks and other public thoroughfares does not preclude liability for others who have assumed a duty with regard to the sidewalk or roadway. *See, Pippins v. City of St. Louis*, 823 S.W.2d 131, 134 (Mo.App. E.D. 1992). Appellant clearly had a duty of its own to conduct its repairs in a non-negligent manner.

■ " 'One may render himself liable for the safety of a highway or sidewalk by the voluntary construction of improvements, the performance of work, or the assumption of some duty with respect to the maintenance or repair of the way.' " *Teichman v. Potashnick Constr., Inc.*, 446 S.W.2d 393, 400 (Mo. banc 1969) (quoting 39 Am.Jur.2d, Highways, Streets and Bridges, § 361, p. 745). "[O]nce a gas company has made an excavation in a public street for its own purposes that excavation continues to exist until such time as the gas company has fulfilled the duty cast upon it by the law to restore the public street to its normal condition and to take care of its work insofar as the rights of the public to the use of the street are concerned that such restoration is permanent in character." *Stenson v. Laclede Gas Co.*,

553 S.W.2d 309, 313 (Mo.App. E.D.1977). Logically, this duty also extends to excavations in a public sidewalk. The gas company's duty is not discharged until the street or sidewalk has been restored to its normal condition. *Id.* A gas company has "a duty to restore the road [or sidewalk] to the same condition that it was before [the gas company] made its excavation in the public street [or sidewalk], and if it failed in this duty, then the excavation still existed, and if it did, then it was a jury question whether the failure to barricade or warn plaintiff of the excavation was the proximate cause of plaintiff's injuries." *Id.* at 315. Point denied.

In its ninth point, Appellant argues that the trial court erred in giving punitive damage instructions to the jury. Appellant claims the evidence submitted at trial was insufficient to support such instructions.

■ The point is devoid of merit. While Appellant generally claims to have been prejudiced by the submission of the punitive damage instructions to the jury, the jury did not award Ms. Benedict any punitive damages, and Appellant has not specifically identified any way in which he was prejudiced. Absent a showing of prejudice, instructional error related to the submission of a punitive damage instruction is not reversible error. *Jordan v. Abernathy*, 845 S.W.2d 86, 88 (Mo.App. E.D.1993). Since Appellant has failed to establish prejudice in the submission of the punitive damage instruction, any error in the submission of that instruction would not constitute reversible error. *Henry v. City of Ellington*, 789 S.W.2d 205, 207 (Mo.App. S.D.1990). Point denied.

10. Moreover, Appellant was allowed to ask Ms. Stout, without objection from Ms. Benedict, whether Ms. Benedict had worked at the Rosebud Lounge. Her testimony in that regard was sufficient to contradict Ms. Benedict's testimony, and the remaining testimony Appellant sought to introduce would not have served to further contradict that testimony.

Finally, Appellant argues that the verdict rendered in the case was excessive and contrary to the weight of the evidence. Appellant claims the verdict far exceeded any proven damages and was based upon inadmissible evidence.

■ In making its argument, Appellant fails to identify any alleged error or to state what relief it was seeking at the trial court level or from this court. Appellant merely states that the verdict was excessive and that numerous errors on the part of the trial court resulted in the jury considering inadmissible evidence.

■ Even if Appellant had set forth a proper point relied on and proper argument on appeal, Appellant's claim is wholly without merit. "The standard of review of a claim that the trial court erred in failing to find the verdict excessive is a narrow one: an appellant must show both that the verdict is excessive and that some event occurred at trial that incited the bias and prejudice of the jury." *Giddens v. Kansas City Southern Railway Co.*, 29 S.W.3d 813, 821–23 (Mo. banc 2000).

■ The mere size of the verdict alone is insufficient to establish that it resulted from bias and passion without a showing of some other error committed during the course of the trial. *Id.* In making its claim that the verdict was based upon inadmissible evidence, Appellant references the arguments made in its previous points. *Id.* at 822. "The errors specifically alleged have not been found to be meritorious; therefore, they cannot serve as a predicate for a finding of excessiveness of the verdict." *Id.*

■ Moreover, "[i]n reviewing verdicts to determine if they are excessive, appellate courts overturn only those verdicts that are obviously out of line and grossly improper." *Id.* Appellant merely claims the $275,000 is "obviously excessive" because the Ms. Benedict incurred less than $5,000 in medical bills for the treatment of her injuries. However, the evidence presented by Ms. Benedict indicated that there was no real treatment available to further improve the pain and disability associated with her coccyx injury and that Ms. Benedict would suffer chronic pain from the injury for the rest of her life. Ms. Benedict's economics expert testified that the present value of Ms. Benedict's lost earnings from now until she reached the age of 67 was $248,901.00. He also testified that the value of the loss of her ability to perform household duties was $204,837.00. Certainly sufficient evidence was presented to support the jury's verdict. Furthermore, the jury did not award punitive damages, and there is no indication of any bias or prejudice on their part. Point denied.

The judgment is affirmed.

All concur.